**Mourad MADRANE, Petitioner**

v.

**Thomas HOGAN, et al., Respondents.**

**Civil Action No. 1:05–CV–2228.**

United States District Court,
M.D. Pennsylvania.

March 26, 2007.

See also 2007 WL 404032.

Jonathan H. Feinberg, Kairys, Rudovsky, Epstein & Messing, LLP, Philadelphia, PA, for Petitioner.

Daryl F. Bloom, Dennis Pfannenschmidt, Mark E. Morrison, United States Attorney's Office, Harrisburg, PA, for Respondents.

## MEMORANDUM

YVETTE KANE, Chief Judge.

■ Before the Court is Petitioner Mourad Madrane's Petition for a Writ of Habeas Corpus by which he challenges the constitutionality of his more than three-year detention in custody of the Bureau of Immigration and Customs Enforcement pending that agency's efforts to remove him from the United States. (Doc. No. 1.) The petition has been fully briefed, and the Court held a hearing on March 19, 2007, during which the parties presented additional evidence and oral argument. For the reasons set forth below, the petition will be granted and a writ of habeas corpus will issue.

## I. Background[1]

Mourad Madrane is a 32–year–old citizen of Morocco who entered the United States on July 8, 1997, with a nonimmigrant visa permitting him to work in this country temporarily. He later attended Northeastern Illinois University in Chicago where he earned a Bachelor's degree in Computer Science. Just over a year after his arrival in the United States, Petitioner met Tiffany Marie Cascio, a United States citizen. Petitioner and Ms. Cascio were married in a civil ceremony in January 1999, followed by a Catholic ceremony in June 1999.[2]

On August 30, 2002, Madrane was convicted in the United States District Court for the Northern District of Illinois of conspiracy to commit access-device fraud, access-device fraud, possession of more than 15 devices with intent to defraud, and possession of device-making equipment. As a result of this conviction, Petitioner was sentenced to 18 months imprisonment followed by three years of supervised release. Petitioner remained free on bond following his conviction and was permitted to self-surrender to the Bureau of Prisons ("BOP") at the Federal Correctional Institution at Allenwood, Pennsylvania ("FCI–Allenwood") at a time specified for the commencement of his incarceration. Petitioner complied with all conditions of his release pending his self-surrender to the BOP and, together with his wife and mother-in-law, drove himself from Chicago to FCI–Allenwood, where he began serving his sentence on November 19, 2002. Petitioner served approximately 15 months of his 18–month sentence, having earned credit for good behavior while in custody.

Upon the conclusion of his federal sentence on March 1, 2004, Petitioner was immediately taken into custody of the Bureau of Immigration and Customs Enforcement ("ICE") at the York County Prison in York, Pennsylvania.[3] On April 2,

1. Throughout these proceedings the parties appear to have been in general agreement regarding the factual background leading to Petitioner's current predicament. After recent appointment of counsel to represent Petitioner in these proceedings, any remaining disagreements or variances regarding the factual backdrop have essentially been resolved, and the Court finds that the parties principally dispute whether Respondents may continue to detain Petitioner under the detention provision mandated by section 236(c) of the INA, 8 U.S.C. § 1226(c), without violating his right to due process under the Fifth Amendment. The parties also dispute the scope of relief that may be afforded to Petitioner and whether this Court is authorized to fashion such relief pursuant to its habeas jurisdiction. Because the parties are in general agreement regarding the factual background, the Court has, where appropriate, relied upon the documents and other exhibits submitted by the parties during these proceedings. On this point, the Court notes that at the conclusion of the March 19, 2007, hearing on this matter, Petitioner's counsel moved for the admission of several exhibits, including the exhibits appended to his pre-hearing memorandum. (Doc. No. 43.) Counsel for Respondents voiced an objection only with respect to certain letters that purported to offer employment to Petitioner in the event he were released from custody on the grounds that the representations set forth in such letters were stale and uncorroborated. The Court noted the Government's objection to these letters, but the Court ultimately agrees with Petitioner that the letters should be admitted as evidence although their value may be limited. Accordingly, to the extent not made explicit on the record, Petitioner's motion to admit the exhibits attached to his pre-hearing memorandum is granted.

2. Petitioner is Muslim; his wife is Catholic.

3. The record is silent regarding the statutory authority pursuant to which ICE took Petitioner into custody following the conclusion of his federal sentence, although Respondents have contended at all times during these proceedings that Petitioner's custody has been mandated by section 236(c) of the INA, 8 U.S.C. § 1226(c), which directs the Attorney General to take into custody criminal aliens

2004, Petitioner was personally served with Notice of Intent to Issue a Final Administrative Order of Removal under section 238(b) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1228(b), advising him that he would be placed into expedited removal proceedings as an alien convicted of an aggravated felony. Thereafter, a Final Order was issued on April 27, 2004, directing that Petitioner be removed to Morocco. Fearing that he would be persecuted and tortured if he were removed to Morocco, Petitioner requested a credible-fear interview under 8 C.F.R. § 208.18. An asylum officer found his fear to be credible and, accordingly, Petitioner's case was referred to an Immigration Judge ("IJ") under 8 C.F.R. § 208.31(e).

On November 4, 2004, IJ Walter A. Durling of the York, Pennsylvania Immigration Court held an individual hearing. At this hearing, Petitioner, through counsel, produced testimonial and documentary evidence to support his application for withholding of removal under the United Nations Convention Against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").[4] In a written decision issued on November 10, 2004, the IJ denied Petitioner's claims for withholding of removal. In his ruling, IJ Durling found that the crime for which Petitioner was convicted was of a particularly serious nature, therefore rendering him ineligible for withholding of removal under 8 C.F.R. § 208.16. With respect to Petitioner's claim for relief under the CAT, the IJ found that Petitioner, though credible, had failed to come forward with sufficient proof that the Moroccan government would torture him or acquiesce in his torture were he removed to that country.

Petitioner, proceeding *pro se*, filed a timely appeal of the IJ's decision to the Board of Immigration Appeals ("BIA"). On March 30, 2005, the BIA affirmed the IJ's decision without opinion.

One week later, on April 7, 2005, Petitioner filed a *pro se* Emergency Petition for a Writ of Habeas Corpus with this Court in which he requested a stay of his removal and asked this Court to review his final order of removal. On that same day, this Court entered an order staying Petitioner's removal from the United States.[5] (*See* docket number 1:CV–05–703, Doc. No.

who, *inter alia*, are deportable by reason of having committed an offense covered in sections 237(a)(1)(b), 237(a)(2)(A)(iii), and 237(a)(2)(A)(i) of the INA. 8 U.S.C. § 1226(c). It is undisputed that ICE immediately took Petitioner into custody on March 1, 2004, the day he concluded serving his federal sentence, and it has never been disputed that Petitioner's conviction caused him to fall within the mandatory detention provision of INA § 236(c). The Court thus presumes that Petitioner has been detained in ICE custody continuously under section 236(c) of the INA since his release from FCI–Allenwood on March 1, 2004.

4. G.A. Res 39/46, U.N. GAOR, 39th Sess., Supp. No. 51, at 197, U.N. Doc. A/39/51 (1984). The Convention Against Torture has been implemented by regulations at 8 C.F.R. §§ 208.16 and 208.18 to require withholding of removal for an alien who can show that it is more likely than not that he will be tortured by the government or with its acquiescence upon removal to a particular country.

5. While Madrane's first habeas proceeding was pending in this Court, and after the Court had entered a stay preventing ICE from removing Petitioner to Morocco, Petitioner contacted the Court on May 16, 2005, to advise that despite the stay of removal, ICE agents attempted to effect his removal on May 11, 2005. (*See* Civil Action No. 1:CV–05–703, Doc. No. 12.) The Court directed Respondents to file a prompt response to Madrane's allegation, and counsel for Respondents confirmed that ICE had "prepared to take Madrane to the airport to effect his removal," but ceased upon confirming that a stay remained in effect. (*See* Civil Action No. 1:CV–05–703, Doc. No. 14.)

4.) Following enactment of the REAL ID Act of 2005, Pub.L. No. 109–13, Div. B, which, among other things, stripped district courts of jurisdiction to hear habeas corpus petitions that challenge final orders of removal, this Court transferred the petition to the United States Court of Appeals for the Third Circuit on May 31, 2005.

Upon the matter being transferred to the Third Circuit, it was converted to a Petition for Review. Starting in July 2005, Petitioner was represented before the Third Circuit by *pro bono* counsel. In his petition for review, Petitioner contended that by being placed in expedited removal proceedings under section 238(b) of the INA, he had effectively been prevented from pursuing his claim for a waiver of inadmissibility under INA § 212(h), 8 U.S.C. § 1182(h), and to have his immigration status changed to lawful permanent resident under INA § 245, 8 U.S.C. § 1255.[6] (*See* Doc. No. 43, Ex. D.) Before the Third Circuit issued a ruling on the Petition for Review, Petitioner and Respondent Attorney General submitted a joint motion evidencing their agreement to reopen Petitioner's removal proceedings, to convert such proceedings from expedited removal under 8 U.S.C. § 1228 to removal proceedings under 8 U.S.C. § 1229, which would permit Petitioner to seek a waiver of inadmissibility under INA § 212(h), 8 U.S.C. § 1182(h). (Doc. No. 48, Ex. P–1.) In the motion, Respondent affirmatively represented that "[i]t is now the government's position that Petitioner is eligible to apply for relief from removal." (*Id.*) Following submission of the parties' joint motion, Petitioner's petition for review before the Third Circuit was dismissed.

On November 15, 2005, Respondents served Petitioner with a Notice to Appear for removal proceedings under INA § 240, 8 U.S.C. § 1229. (Doc. No. 10, Ex. A.) On the same day, Petitioner was served with a Notice of Custody Determination, which directed that he be detained in ICE custody pursuant to INA § 236(c). (Doc. No. 10, Ex. B.) The Notice of Custody Determination expressly advised Petitioner as follows: "You may not request a review of this determination by an immigration judge because the Immigration and Nationality Act prohibits your release from custody." (Doc. No. 10, Ex. B.)

Prior to the parties agreeing to reopen Petitioner's removal proceedings under INA § 240, Petitioner commenced this ac-

---

**6.** Section 1255(a) provides that an alien may adjust status to that of a lawful permanent resident upon the following conditions: if the alien (1) applies for adjustment, (2) is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) has an immigrant visa immediately available. 8 U.S.C. § 1255(a). Petitioner asserted that he readily met the first and third requirements, but his conviction and sentence rendered him inadmissible under 8 U.S.C. § 1 182(a)(2)(A)(i) (crime of moral turpitude). However, Petitioner argued that he was *prima facie* eligible for a waiver of this ground of inadmissibility under INA § 212(h), 8 U.S.C. § 1182(h), which provides for waivers "in the case of an immigrant who is the spouse ... of a citizen of the United States ... if it is estab-lished to the satisfaction of the Attorney General that the alien's denial of admission would result in extreme hardship to the United States citizen." 8 U.S.C. § 1182(h)(1)(B). Accordingly, Petitioner argued that his removal proceedings should have been converted from INA § 238(b), 8 U.S.C. § 1228(b), to INA § 240, 8 U.S.C. § 1229, to allow him to seek a discretionary waiver under § 212(h), 8 U.S.C. § 1182(h). Because such relief is discretionary, Petitioner was prevented from seeking a waiver while subject to expedited removal proceedings under INA § 238(b), 8 U.S.C. § 1228(b). *See* 8 U.S.C. § 1228(b)(5) (providing that "[n]o alien" in expedited removal proceedings "shall be eligible for any relief from removal that the Attorney General may grant in the Attorney General's discretion.").

tion on October 31, 2005, seeking habeas corpus relief pursuant to 28 U.S.C. § 2241 on the grounds that his extended detention throughout his ongoing immigration proceedings was unconstitutional. Petitioner explained the basis for his petition as follows:

> Narrowly framed, this habeas corpus proceeding under 28 U.S.C. § 2241 concerns the constitutionality of the prolonged detention of Petitioner while he awaits a decision from a United States Court of Appeals on his petition for review of a final order of removal. Respondent violated Petitioner's constitutional right to a meaningful individualized determination of his status pending adjudication of the validity of the removal order, as contemplated by 8 C.F.R. § 241.4(i). Petitioner alleges that his incarceration by respondent while he contests his removal order is unreasonable and (1) violates his substantial and procedural right to due process; and (2) violates his right under the Equal protection clause where similarly situated aliens, have been treated differently.

(Doc. No. 10, at 1.)[7] At the time his petition was filed, Petitioner represented that he had been held in custody for nearly two years at various detention centers. Petitioner underscored that by the petition he was "exclusively challenging his continued detention by [Respondents], not the merits of his removal order." (*Id.* at n. 1.)

On December 19, 2005, Respondents filed a response in which they argued that the petition should be denied. Specifically, Respondents argued that Madrane was being held as a pre-final order detainee under INA § 236(c) as an alien convicted of an aggravated felony pursuant to § 237(a)(2)(A)(iii), having been convicted of a crime involving moral turpitude committed within five years after admission for which a sentence of one year or longer may be imposed. Accordingly, Respondents asserted that Petitioner remains subject to pre-final order detention pursuant to INA § 236(c)(1)(B), 8 U.S.C. § 1226(c)(1)(B).[8] Respondents note that the crimes for which Madrane was convicted—namely, conspiring to fraudulently obtain credit card numbers and using a credit card skimmer to purchase goods and merchandise totaling more than $180,000— are covered in §§ 237(a)(2)(A)(iii) and (B) of the INA, and that Madrane's crimes involved moral turpitude that did not arise out of a single scheme of conduct, thus making him removable under § 237(a)(2)(A)(ii) of the INA. Finally, Respondents contend that in *Demore v. Hyung Joon Kim,* 538 U.S. 510, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003), the United States Supreme Court held that mandatory pre-final order detention under § 236(c) of the INA does not violate any protections guaranteed to aliens under the United States Constitution. For those reasons, Respondents argue that Petitioner's habeas petition must be denied.

In a letter received on May 18, 2006, Petitioner noted that he was scheduled to have a merits hearing before the IJ on

---

**7.** Contrary to Petitioner's representations at the outset of this matter, Petitioner does not have a final order of removal.

**8.** Section 236(c)(1) of the INA provides as follows:

(c) Detention of Criminal Aliens.—
(1) Custody.—The Attorney General shall take into custody any alien who—

(A) is inadmissible by reason of having committed any offense covered in section 212(a)(2),
(B) is deportable by reason of having committed any offense covered in section 237(a)(2)(A)(ii), (A)(iii), (B), (C), or (D).

8 U.S.C. § 1226(c).

June 21, 2006. (Doc. No. 22.) On June 29, 2006, the Court ordered Respondents to file a status report regarding the outcome of that hearing. (Doc. No. 23.) On July 6, 2006, Respondents submitted a status report indicating that the June 21, 2006, hearing had been rescheduled to July 27, 2006, upon a motion for continuance filed by Petitioner's counsel. Respondents appended copies of three motions by which Petitioner moved to continue his merits hearings, delaying the hearing from April 12, 2006, to May 17, 2006; from May 17, 2006, to June 21, 2006; and from June 21, 2006, to July 27, 2006, all granted upon Petitioner's request.

On July 27, 2006, IJ Durling convened a merits hearing and, on September 13, 2006, granted Petitioner a waiver of inadmissibility under INA § 212(h) and an adjustment of status to lawful permanent resident under INA § 245. The Bureau of Immigration and Customs Enforcement timely appealed the IJ's decision to the BIA. As a result of this appeal, Respondents have asserted that the IJ's ruling has not become final and therefore, because Petitioner remains a pre-final order detainee, he remains ineligible for release as his continued custody is statutorily mandated under § 236(c) of the INA.

Although Respondents took a timely appeal of the IJ's ruling, the appeal process has been delayed for several months as a result of IJ Durling's failure to record substantial portions of the record testimony during the hearing on Madrane's petition for § 212(h) relief, thus resulting in an incomplete record for review on appeal. As a result of the incomplete record, Respondents moved the BIA to suspend the appellate briefing schedule. Almost two months later, on December 19, 2006, the BIA issued a brief order remanding the case to the IJ for reconstruction of the record. Thereafter, on February 28, 2007,

IJ Durling issued an order transmitting the reconstructed record to the BIA. The parties have advised the Court that the BIA has issued a new briefing schedule directing the parties to file their submissions by March 28, 2007.

On February 1, 2007, this Court issued a memorandum and order, subsequently amended on February 5, 2007, addressing Petitioner's claim for habeas relief and Respondents' legal arguments in opposition thereto. (Doc. No. 36.) In the order, the Court determined that a hearing on Petitioner's claims was warranted and directed Respondents to be prepared at the hearing to justify Petitioner's continued detention with evidence regarding his potential risk of flight and potential danger to the community in the event he were released. Immediately following entry of this order, the Court sought to identify counsel willing to represent Petitioner through the remainder of these proceedings, and subsequently appointed Attorney Jonathan Feinberg, who had previously served as Petitioner's counsel in his petition for review before the Third Circuit. During a pre-hearing telephone conference with counsel for both parties held on Friday, March 16, 2007, the Court confirmed that the Court expected to hear evidence regarding ICE's justification for Petitioner's continued detention, including evidence regarding dangerousness and risk of flight. On this call, counsel for Respondents asserted that this Court lacked jurisdiction to convene a bail hearing in the context of Petitioner's habeas petition, and suggested that if the Court were to conclude that Petitioner was entitled to relief, that the matter should be directed to the Immigration Court for further proceedings. Counsel for Petitioner objected to this suggestion, noting that this Court has jurisdiction over this case pursuant to its habeas jurisdiction, and that the Court is therefore empowered to grant appropriate relief.

## II. *The March 19, 2007, Hearing to Consider Petitioner's Claims*

On March 19, 2007, the Court convened a hearing at which the Government was offered the opportunity to present evidence regarding Petitioner's dangerousness or risk of flight. During this hearing, Respondents presented limited testimony and no evidence that would have supported the Court finding that Petitioner was either dangerous or a flight risk. The Government firmly objected to the Court's authority to conduct the hearing and offered only two witnesses, both representatives of ICE, who testified about Petitioner's ongoing removal proceedings and his request for release from custody during the pendency of such proceedings.

Respondents first called Jeffrey Bubier, Assistant Chief Counsel of ICE charged with representing ICE in removal proceedings in York, Pennsylvania. Mr. Bubier testified that he represented ICE during Petitioner's merits hearing before IJ Durling. Mr. Bubier offered his opinion that the IJ's decision was clearly erroneous and expressed his confidence that ICE would prevail on appeal before the BIA given the applicable legal standards. Mr. Bubier further testified regarding the different removal proceedings to which Petitioner has been subjected since March 2004, and attested to his belief that INA § 236(c) mandated Petitioner's continued detention throughout these proceedings. Additionally, Mr. Bubier testified that Petitioner had never requested a bond hearing from an Immigration Judge, and appeared to suggest that Petitioner had therefore not exhausted the administrative remedies that might have been available to him. Notwithstanding this testimony, on examination of Petitioner's Notice of Detention issued on November 15, 2005, Mr. Bubier acknowledged that by this document Petitioner was informed that he was not permitted to seek a renewed custody determination. Mr. Bubier conceded that the choice of language used in the notice was "unfortunate," but Mr. Bubier nonetheless still suggested that Petitioner and his counsel were at fault for not pursuing a bond hearing in any event. (Tr. 34.) Mr. Bubier offered no opinion or other testimony regarding Petitioner's risk of flight or his dangerousness to the community in the event he were released on conditions pending the conclusion of his removal proceedings.

Respondents next called Kent Frederick to testify. Mr. Frederick, Chief Counsel for ICE's Philadelphia Office, also testified generally regarding Petitioner's removal proceedings to date. Mr. Frederick stated that the Moroccan consulate had previously issued a travel document for Petitioner's return, and that he expected the consulate would issue another travel document in the event ICE obtains a final order directing Petitioner's removal. Mr. Frederick indicated that it takes no more than a few weeks for ICE to obtain the necessary travel papers to facilitate an alien's removal following issuance of a final order. If an alien is out of custody when a final order of removal is issued, Mr. Frederick explained that ICE would issue the alien what is colloquially referred to as a "bag and baggage letter" that advised the alien of the scheduled date on which he would be removed. Mr. Frederick testified that if an alien fails to appear in accordance with the instructions in the "bag and baggage letter," ICE could seek to impose civil penalties. When asked whether ICE had the ability to conduct electronic monitoring of Petitioner in the event he were permitted to return to Chicago, Mr. Frederick testified that he could not be certain regarding the availability of such monitoring in Petitioner's case. Following some brief questions from the Court, Respondents requested that they be permitted to rely

upon the representations set forth in Mr. Frederick's declaration filed with this Court on February 16, 2007.[9] Nothing in the declaration or in Mr. Frederick's testimony before the Court addressed Mr. Frederick's opinion regarding Petitioner's dangerousness or risk of flight in the event he were released. (Doc. No. 37.)

Petitioner was the final witness called.[10] During his testimony, Petitioner provided information regarding his arrival in the United States, his educational background, and the strength of his marriage to Mrs. Madrane. Petitioner testified that he was arrested in September 2001 on federal charges relating to credit-card fraud, and that he was released on unsecured bond with reporting conditions and pretrial visits for a period of 14 months. Petitioner testified that throughout this period he remained in compliance with the conditions of his pretrial release. Additionally, he discussed his cooperation with the Government, during which he provided incriminating information regarding a co-defendant.

Petitioner explained that he was permitted to self-surrender to begin serving his 18–month sentence 11 weeks after sentence was imposed. Petitioner testified that during this period of time he was made aware that his federal conviction could result in adverse immigration consequences, including his removal from the United States. Petitioner also testified that he scrupulously complied with the conditions of release and self-surrender notwithstanding his fear that he would be tortured or killed if he were returned to Morocco. Petitioner testified that on No-

vember 19, 2002, he drove himself, his wife, and his mother-in-law from Chicago to White Deer, Pennsylvania, where he began serving his sentence in the low-security facility at FCI–Allenwood.

When questioned about his requests for various extensions of his merits hearing before the IJ, Petitioner explained that the time was necessary to develop fully his legal arguments in support of his request for a § 212(h) waiver and emphasized that his merits hearing was his "one and only shot at gaining adjustment of status" that would allow him to remain in the United States with his wife. Additionally, Petitioner pointed to the fact that he prevailed on his claim before IJ Durling, and he asserted, therefore, that the requested continuances were well taken.

Petitioner testified that he has been held in ICE custody in York, Pennsylvania, for more than three years. During this time, Petitioner noted that he has committed no disciplinary infractions and has served the prison facility in various ways, including through work in the law library and by assisting other detainees in their legal proceedings and with translation services.

Upon being questioned regarding his plans in the event he were released, Petitioner testified that he would return to his wife and her family in Illinois and would promptly seek employment. In this regard, Petitioner testified that he has prepared an application for employment authorization and he stands ready to submit such application immediately if released. Petitioner opined that because of his educational background, he is optimistic about

---

9. In this declaration, Mr. Frederick recites the history of Petitioner's removal proceedings. The declaration also catalogues Petitioner's several requests for continuances of his merits hearing before the IJ on his § 212(h) claim for a waiver of inadmissibility. (Doc. No. 37.)

10. Petitioner's counsel noted on the record the Petitioner's family members could be made available to testify at a later date by teleconference in the event the Court deemed such testimony necessary to adjudicate Petitioner's claim for release.

his ability to secure employment. Petitioner testified that he had no intention to flee, and he emphasized both that he is only interested in obtaining legal authority to remain in this country with his wife and that he does not want what he described as a "fugitive life." (Tr. 70.) On cross examination, Petitioner acknowledged that he had overstayed his initial work visa that permitted his temporary stay in the United States. He also acknowledged that he does not own a car and that he does not know how much money is currently held in his and his wife's joint bank account. Petitioner also conceded that he last saw his wife in July 2006 during his merits hearing and that otherwise his wife has been able to visit him once during his detention. Petitioner acknowledged that his own family members reside in Morocco.

Following the foregoing testimony, counsel for Respondents argued that Petitioner has "virtually no incentive to appear," and defended ICE's asserted bases for Petitioner's detention by contending that the justification for detaining aliens pending removal proceedings does not diminish over time. (Tr. 80–81.) Respondents argued that as a result of his admitted fear of persecution or death if he were returned to Morocco, Petitioner has even less incentive to comply with conditions of release. Counsel also referenced Petitioner's lack of a home or other material assets, his lack of direct family in this country, and the lack of evidence that Petitioner could secure employment as additional reasons to deny Petitioner's request for release.

In contrast, Petitioner argued that Respondents had presented virtually no evidence regarding Petitioner's dangerousness or risk of flight, but instead relied almost exclusively on the fact that Petitioner remained subject to removal proceedings and might, at some point, be ordered removed from the United States, to justify his continued detention. With respect to Respondents' suggestion that Petitioner's fear of being removed to Morocco provided him with every incentive not to appear, Petitioner asserted that he has been well aware that his federal conviction carried with it potentially adverse immigration consequences, including removal, and notwithstanding this knowledge, he has at all times scrupulously adhered to judicially mandated conditions of release, including remaining free on bond for 14 months pending his conviction and sentence, and being permitted to self-surrender 11 weeks after sentence was imposed. Additionally, Petitioner noted that he incurred no disciplinary violations while a federal inmate at FCI–Allenwood, nor during his detention in the York County Prison. In addition to recounting evidence of his prior good conduct while on release, Petitioner emphasized that because he prevailed on his claims before the IJ, he has even greater incentive to comply with conditions of release and not jeopardize his tentative right to remain in the United States.

### III. *Discussion*

The Respondents' response to Petitioner's request that he be released from custody pending resolution of his removal proceedings is straightforward. First, Respondents underscore that Petitioner's detention during his pre-final order removal proceedings is not discretionary, but is instead mandated by federal statute. Secondly, Respondents rely on the Supreme Court's decision in *Demore*, where a narrow majority of the Supreme Court held that, at least in typical cases, section 236(c) of the INA does not violate due process. Most recently, Respondents have asserted that this Court lacks authority to grant Petitioner habeas corpus relief through a *de facto* bail hearing and that if the Court determined that Petitioner was entitled to

habeas relief, the Court must remand or otherwise transfer the matter to an IJ for a custody determination. These arguments will be addressed in turn.

### A. *INA § 236(c) and Demore v. Kim*

The Court recognizes the unqualified mandate that § 236(c) of the INA imposes upon the Attorney General. The Court further recognizes that in *Demore* a bare majority of the Supreme Court upheld the constitutionality of § 236(c), at least against the facts that the case presented. Respondents argue that it therefore follows that Petitioner's continued detention is statutorily mandated and constitutionally permissible.

Nevertheless, a careful reading of the Supreme Court's decision reveals it to be not the sweeping pronouncement suggested by Respondents, but rather a narrower holding grounded in repeated reference to the anticipated brevity that pre-final order removal proceedings are expected to take in the ordinary course. The emphasis in *Demore* on the anticipated limited duration of the detention period is unmistakable, and the Court explicitly anchored its holding by noting a "brief period," *Demore,* 538 U.S. at 513, 523, 123 S.Ct. 1708, of "temporary confinement," *id.* at 531, 123 S.Ct. 1708. Indeed, the references to the brevity and limited nature of confinement can be found throughout *Demore. See id.* at 513, 123 S.Ct. 1708 ("Congress ... may require that [criminal aliens] be detained for the *brief period* necessary for their removal proceedings."); *id.* at 523, 123 S.Ct. 1708 ("Respondent argued that the Government may not ... detain him for the *brief period* necessary for his removal

proceedings."); *id.* at 526, 123 S.Ct. 1708 (noting the "Court's longstanding view that the Government may ... detain deportable aliens during the *limited period* necessary for their removal proceedings"); *id.* at 529 n. 12, 123 S.Ct. 1708 (noting "the *very limited time* of the detention at stake") (emphasis added). Moreover, in upholding the constitutionality of § 236(c), the Supreme Court specifically referred to statistics demonstrating the typically brief period that pre-final order removal proceedings require and the attendant short periods of detention that are therefore typically imposed. Relying on statistics compiled by the Executive Office for Immigration Review, the Supreme Court noted that in 85% of cases in which aliens were detained pursuant to § 236(c), removal proceedings were completed within an average of 47 days, with a median of 30 days. *Id.* at 529, 123 S.Ct. 1708. Furthermore, the Court noted that even in the remaining 15% of cases, in which an alien appeals an Immigration Judge's ruling to the Board of Immigration Appeals, an appeal takes an average of four months, with an even shorter median time. *Id.* As the United States Court of Appeals for the Ninth Circuit recently commented, "[t]here is no indication anywhere in *Demore* that the Court would countenance an indefinite detention." *Nadarajah v. Gonzales,* 443 F.3d 1069, 1081 (9th Cir.2006).[11]

Accordingly, numerous courts that have confronted pre-final order detainees' challenges to their extended confinement have endeavored to apply the general rule announced in *Demore* to the specific facts of the habeas petitions presented to them where pre-final order detainees have been held in custody for one or more years

---

**11.** As noted, nothing in *Demore* declares that multi-year detention under § 236(c) would necessarily be constitutional, and Justice Kennedy identified this potential problem as presenting an open question. *See Demore,* 538 U.S. at 532, 123 S.Ct. 1708 (Kennedy, J., concurring) (alien "could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified").

while their removal proceedings wound their way through the administrative and appellate processes. Several courts have found that due process required that aliens subjected to lengthy mandatory detention be given bail hearings or have otherwise ordered their release in lieu of a bail hearing. For example, in *Ly v. Hansen*, 351 F.3d 263 (6th Cir.2003), the Sixth Circuit found that following *Demore* the proper interpretation of § 236(c) was to "[construe] the pre-removal detention statute to include an implicit requirement that removal proceedings be concluded within a reasonable time, [thereby avoiding] the need to mandate the procedural protections that would be required to detain deportable aliens indefinitely." *Id.* at 270. On this standard, the Sixth Circuit "affirm[ed] the grant of habeas corpus and the district court's finding that the incarceration of 18 months pending removal proceedings is unreasonable, [without requiring] the United States to hold bond hearings for every criminal alien detained under § 236." *Id.* Although the Sixth Circuit declined to create a rigid guideline of what would constitute a reasonable or unreasonable length of pre-final order detention, the court emphasized that habeas relief should be available for aliens whose particular removal proceedings were taking an unusually long time to complete: "The INS may detain prima facie removable aliens for a time reasonably required to complete removal proceedings in a timely manner. If the process takes an unreasonably long time, the detainee may seek relief in habeas proceedings." *Id.* at 268.

Subsequent to *Ly*, courts within and without the Sixth Circuit have found habeas relief to be warranted in cases where aliens have been subject to prolonged pre-final order detention under § 236(c). *See, e.g., Tijani v. Willis*, 430 F.3d 1241, 1242 (9th Cir.2005) (finding that the authority conferred by 8 U.S.C. § 1226(c) "[applies] to expedited removal of criminal aliens" and finding that alien's two-year and four month detention to be "not expeditious;" recognizing that further administrative and judicial review would take more than a year to complete; and ordering petitioner's release unless within 60 days the government provided petitioner with a bail hearing before an IJ with the authority to order his release unless the government established that petitioner was a flight risk or a danger to the community); *Diomande v. Wrona*, No. 05–73290, 2005 WL 3369498, *2–3, 2005 U.S. Dist. LEXIS 33795, *4–7 (E.D.Mich. Dec. 12, 2005) (granting habeas relief and ordering alien released on $10,000 bond where the petitioner had been detained in pre-final order proceedings for nearly two years and had recently been granted withholding of removal by an IJ that was under appeal at the BIA, where the court found it "more than possible, indeed certain, that this case will proceed through the circuitry of administrative and judicial appeals for several additional months, and most likely, several years;" where petitioner had a fiancé and daughter in close proximity; and where the government had presented no evidence that petitioner posed a danger to the community or a risk of flight); *Fuller v. Gonzales*, No. 3:04–CV–2039, 2005 WL 818614, *5–6, 2005 U.S. Dist. LEXIS 5828, *14–17 (D. Conn. April 8, 2005) (granting habeas petition and ordering government to hold a prompt bond hearing where alien had been detained for more than two years under § 236(c)); *see also Nadarajah v. Gonzales*, 443 F.3d 1069 (9th Cir.2006) (in an action where the government sought to hold an alien in detention pursuant to the general immigration detention statute set forth at 8 U.S.C. § 1225(b)(1)(B)(ii) and (b)(2)(A), finding that government was not empowered to detain aliens indefinitely and concluding that alien's five-year de-

tention had been unreasonable; ordering petitioner's immediate release subject to conditions to be set by a delegate of the Attorney General); *Parlak v. Baker*, 374 F.Supp.2d 551, 561 (E.D.Mich.2005) (ordering pre-final order detainee released immediately for reasons other than the length of his eight-month detention, but finding it appropriate to note "[g]iven the legal intricacies surrounding Petitioner's removal, it will very likely take years for a final determination of Petitioner's status. It is certain that the removal proceedings will be protracted as this case winds through the appellate process. In determining whether Petitioner's detention is unreasonable, the Court cannot ignore the likely future course of the case which shows a real certainty that Petitioner is facing a significant period of detention for an indeterminate period of time. This amounts to a violation of due process under the circumstances.").

██ Turning to the facts of the instant petition, Petitioner Mourad Madrane has now been held in ICE custody for more than three years while he challenges the efforts of the United States to have him removed to Morocco. This length of de-tention is approximately 23 times the average length of detention that the Supreme Court found was required to finalize removal proceedings in 85% of cases.[12] In contrast to the four months of detention the Supreme Court noted was the average in the remaining 15% of removal cases, Petitioner has been detained almost nine times this length of time. The Court is mindful that Petitioner has, to some degree, contributed to the length of time it has taken to adjudicate his challenges to Respondents' attempts to have him removed. While his petition has been pending in this Court, Petitioner's scheduled merits hearing was continued on several occasions, each time at Petitioner's request. Nevertheless, these delays, which appear to have extended the process for approximately six months, make up only a fraction of the amount of time Petitioner has been held in custody during his removal proceedings, and the fact that Petitioner obtained continuances and prevailed on his claims before an IJ in having his status adjusted do not serve to vitiate the Court's concern over what appears to be an extraordinarily lengthy deprivation of liberty.[13] The Court's concern regarding this length of detention is made even more

12. Respondents have recently emphasized that during the first 21 months of his detention in ICE custody, Petitioner had been subject to expedited administrative removal proceedings under INA § 238(b), 8 U.S.C. § 1228(b), and appeals of IJ Durling's order of removal. In contrast, Respondents note that in November 2005, Petitioner was removed from § 238(b) proceedings and placed in § 240 proceedings. The import of this distinction with respect to Petitioner's claim for habeas relief is not clear to the Court, as it has apparently always been Respondents position that Petitioner has been lawfully detained pursuant to INA § 236(c). The Court thus does not find that Respondents have clearly identified a meaningful distinction to be drawn from the fact that Petitioner has been subject to two different types of removal proceedings since March 2004, given that Peti-

tioner has remained continuously in ICE custody throughout this time.

13. The Court also notes that for 21 months between March 2004 and November 14, 2005, Petitioner had been subject to expedited administrative removal proceedings, and related appeals, until Respondents conceded that he was eligible to seek his claims for a waiver of inadmissibility under INA § 212(h) and adjustment of status under INA § 245. Although it can be argued that Petitioner extended the length of his subsequent proceedings under INA § 240 through his own request for continuances, there is evidence of record to support his contention that each of these requests to delay the proceedings was necessary. (Doc. No. 43, Ex. E, Affidavit of Valerie A. Burch.)

acute by the fact that Respondents have appealed to the BIA from IJ Durling's decision that granted Petitioner a waiver of inadmissibility and adjusted his status to permanent legal resident, and the fact that the administrative and appellate process that has yet to be exhausted may be considerably time-consuming.[14] In light of these facts and the forecast of additional future appeals or proceedings that could result in Petitioner being detained for many months in addition to the nearly three years he has already been held in custody, the Court cannot adopt Respondent's inflexible position that Petitioner may be detained for as many years as it may take to obtain a final order regarding his removal simply on the basis of the mandatory language of § 236(c), particularly where the Supreme Court in *Demore* did not expressly contemplate the constitutionality of such protracted detention, and where Defendants have offered no other compelling justification or authority for such indefinite detention of this particular alien at any point during these proceedings.

Upon consideration of the foregoing and the evidence presented by both parties in support of and opposition to Petitioner's request for relief, the Court concludes that Petitioner's extended detention in ICE custody for more than three years while ICE has pursued its efforts to remove Petitioner has resulted, at this point, in a violation of Petitioner's right to due process and is therefore unconstitutional.[15] Accordingly, the Court will grant Petitioner a writ of habeas corpus.

### B. *Jurisdiction to Grant a Writ of Habeas Corpus*

Respondents suggest that if this Court determines that Petitioner is entitled to habeas relief and that rote application of § 236(c) cannot justify Petitioner's ongoing detention without a custody determination by an IJ, the Court must direct the Immigration Court to convene a bond hearing, as this Court is without authority to conduct such a hearing in connection with these proceedings. In support of this argument, Respondents direct the Court's attention to *INS v. Ventura*, 537 U.S. 12, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002), and *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985), which Respondents argue operate to restrict the Court's authority to fashion relief in a habeas proceeding such as this case. Review of these cases reveals that neither restricts—much less even addresses—a district court's authority to grant an alien habeas relief from custody in immigration proceedings.

In *Ventura*, the Supreme Court in a per curiam opinion found that the United

---

**14.** As noted, Respondents' appeal of IJ Durling's decision to the BIA has been delayed through no fault of Petitioner, thus further prolonging Petitioner's detention while his removal proceedings wind their way through the administrative channels. As a result of these delays, the parties have not yet submitted their briefs to the BIA.

**15.** Although Respondents attempt to fault Petitioner for not requesting a bond hearing from an IJ, the Court cannot agree that Petitioner's failure to request such hearing should operate to prevent him from seeking release through habeas. After all, Respondents ex-

plicitly advised Petitioner in writing that he was not permitted even to request a review of his custody determination by an IJ "because the Immigration and Nationality Act prohibits your release from custody." (Doc. No. 10, Ex. B.) Mr. Bubier acknowledged that this was an "unfortunate" use of language in the notice, but continued to assert that Petitioner should have requested a bond hearing anyway, as he had counsel who should have known that ICE's own language was erroneous. (Tr. 34.) The Court disagrees with this contention.

States Court of Appeals for the Ninth Circuit committed clear legal error when, on direct review of an administrative judgment of the BIA denying a Guatemalan's claim for political asylum, the court conducted a *de novo* inquiry into the matter and reached its own conclusions based upon such inquiry. The Supreme Court held that by doing so, the appellate court improperly intruded upon the domain that Congress had entrusted exclusively to the BIA. *Ventura*, 537 U.S. at 16, 123 S.Ct. 353. The Court emphasized that "'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Id.* (quoting *Florida Power & Light Co.*, 470 U.S. at 744, 105 S.Ct. 1598). The Court thus held that "[g]enerally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands." *Id.* The Court further noted that this principle has "obvious importance in the immigration context." *Id.* at 16–17, 123 S.Ct. 353.

*Florida Power & Light*, in contrast, did not arise in the context of immigration proceedings, but instead presented as its primary question whether a court of appeals properly had jurisdiction to review as a final order a decision of the Nuclear Regulatory Commission declining to institute a proceeding pursuant to a particular federal regulatory provision. The Supreme Court determined that the courts of appeal have exclusive initial authority to review such denials as final orders, regardless of whether or not a hearing before the Commission had occurred. *Florida Power & Light Co.*, 470 U.S. at 737, 105 S.Ct. 1598. Although the central holding in this case has no apparent relevance to the instant case, it appears that Respondents are contending that another aspect of the Supreme Court's holding regarding the proper standard of review of agency decisions by the courts of appeals under the Administrative Procedures Act has a bearing on the issue before this Court in the instant habeas proceeding. In this regard, the Supreme Court held that "the task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Id.* at 744, 105 S.Ct. 1598 (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). The Supreme Court further held as follows:

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.

*Id.*

Neither *Ventura* nor *Florida Power & Light* address the scope of a district court's habeas corpus jurisdiction under 28 U.S.C. § 2241, nor do these decisions speak to a district court's authority to fashion habeas relief in the event it concludes such relief is warranted or required. Accordingly, the Court finds that these decisions simply do not support Respondents' position that the Court was without authority to convene the March 19 hearing and may not independently fashion relief it finds to be warranted in light of Petitioner's extended deprivation of liberty.

▉ Respondents appear to have interpreted the instant proceedings as the

equivalent of appellate review of a discretionary agency decision regarding Petitioner's custody. To the extent Respondents have characterized the proceedings in this way, they are mistaken. This action, brought for habeas corpus relief, does not challenge the initial determination that Petitioner's federal convictions subjected him to mandatory detention under § 236(c) of the INA; Petitioner's counsel has made clear that Petitioner does not dispute that his conviction initially placed him within the ambit of § 236(c). What Petitioner has challenged in this action is the constitutionality of his extended and continuous custody during his removal proceedings, which Petitioner contends violates his constitutional right to due process under the Fifth Amendment. The Court is thus not reviewing a decision of the IJ regarding Petitioner's initial custody determination; rather, the Court is considering the constitutionality of Petitioner's extended deprivation of liberty while he remains subject to ongoing removal proceedings.[16]

For these reasons, the Court rejects Respondents' contention that the Court lacks jurisdiction to consider Petitioner's claim and to convene a hearing to consider factors that bear upon Petitioner's claim for release.

## C. *Relief*

■ In this Court's previously issued amended memorandum and order, the parties were directed to appear for a hearing to consider Petitioner's continued detention. Respondents were specifically directed "to provide justification for Petitioner's continued detention, including, without limitation, evidence to demonstrate his potential risk of flight and potential danger to the community in the event he is ordered released." (Doc. No. 36, at 10.) As noted above, Respondents relied upon the direct testimony of Jeffrey Bubier and Kent Frederick, and limited cross examination of Petitioner, to address these concerns. Review of the testimony of Messrs. Bubier and Frederick reveals virtually nothing about their opinions regarding Petitioner's dangerousness or risk of flight, nor any facts that would directly bear upon these considerations. Respondents' witnesses, therefore, did not persuade the Court that Petitioner presents any particular concern regarding a danger to the community or a risk of flight in the event he is released.[17]

Consideration of Petitioner's testimony, both on direct and cross examination, leads the Court to find that Petitioner would not present a danger to the community or a

---

**16.** To the extent Respondents have suggested that the Court lacks authority to consider Petitioner's claim or to order relief on the grounds that Petitioner has never requested a custody review or a bond hearing from an IJ, the Court cannot agree. As an initial matter, Respondents have not identified any authority that would preclude the Court from exercising its habeas jurisdiction to consider Petitioner's challenge to his continued mandatory detention in ICE custody. Indeed, the Supreme Court in *Demore* found that federal courts had jurisdiction to consider a claim that mandatory detention under § 236(c) was unconstitutional in habeas corpus proceedings. *Demore*, 538 U.S. at 516–17, 123 S.Ct. 1708. In this case, Petitioner has challenged

the constitutionality of his continuous protracted detention under this statute, a claim the Court has found was not resolved by *Demore*. The Court thus does not find that its authority to consider Petitioner's claims in habeas and to fashion appropriate relief is affected by the fact that Petitioner did not first seek a custody review or a bond hearing from an IJ.

**17.** During a telephone conference with counsel on March 16, 2007, counsel for the United States conceded that Respondents did not believe Petitioner to be dangerous, but asserted that he remained a flight risk given the posture of his removal proceedings.

flight risk if he is released. Petitioner's unchallenged testimony reveals that he complied with all conditions imposed upon him during his pretrial release for 14 months after being charged with the federal crimes of which he was later convicted. Following his conviction, Petitioner was permitted to remain free for 11 weeks, and to self-report to the BOP to begin serving his sentence. The evidence reveals that Petitioner complied with all applicable conditions during this time, and that Petitioner drove himself to the prison to begin serving his sentence on the date designated for his surrender. Notably, the evidence also reveals that Petitioner was at all times on notice that his federal conviction could adversely affect his right to remain in the United States, and that Petitioner believed and continues to believe that he may be subject to torture or death if he is returned to Morocco. Notwithstanding this fear, Petitioner complied with all conditions of relief, including reporting requirements, he cooperated with law enforcement authorities, and he turned himself in to begin serving his sentence as directed. Petitioner testified that he does not wish to lead a fugitive lifestyle, and that he is committed exclusively to seeking a legal right to remain this country with his wife. The Court found Petitioner's testimony to be credible and concludes from the testimony and evidence of record that Petitioner is neither a flight risk nor a danger.

Respondents offered no evidence to refute the findings of the IJ regarding Petitioner's strong marriage and family ties and low risk of flight, or Petitioner's testimony to the same effect. In contrast, the evidence supports a finding that Petitioner has a supportive familial community which anxiously awaits his return, and the Court thus finds it likely that Petitioner will remain with his wife and in proximity to her family during his release.[18]

Upon consideration of the testimony presented to the Court, and the documentary exhibits introduced as evidence for the Court's consideration, the Court concludes that Petitioner represents neither a danger to the community nor a flight risk. Therefore, the Court having concluded that under all of the foregoing circumstances Petitioner's continued detention is no longer constitutional, Petitioner's Petition for a Writ of Habeas Corpus will be granted. Petitioner shall be released from the York County Prison forthwith, subject to the conditions set forth in the order that follows.[19]

### ORDER

**AND NOW,** this 26th day of March 2007, for the reasons fully set forth in the within memorandum, **IT IS HEREBY ORDERED THAT** Petitioner's Petition for a Writ of Habeas Corpus (Doc. No. 1) is **GRANTED** and Petitioner shall be released on his personal recognizance during the pendency of his removal proceedings and subject to the conditions set forth below.

**IT IS FURTHER ORDERED THAT** Respondents shall facilitate Petitioner's release from custody not later than 5:00 p.m. on Tuesday, March 27, 2007.

**IT IS FURTHER ORDERED THAT** Petitioner shall abide by the following con-

---

**18.** The Court's finding regarding the strength of Petitioner's marriage and family ties finds additional support in IJ Durling's decision. (Doc. No. 43, Ex. A.)

**19.** The Court spoke with counsel for Petitioner and Respondents on March 26, 2007, to advise them that a writ would issue and to solicit input regarding appropriate conditions that would be imposed.

ditions upon release pending resolution of his removal proceedings:

1. To the extent he has not already done so, Petitioner shall surrender his passport to the Attorney General and shall refrain from applying for any additional passports.

2. Petitioner shall not travel outside of the Northern District of Illinois.[20]

3. Petitioner shall live with his wife and/or his wife's family.

4. Petitioner shall provide this Court and the Bureau of Immigration and Customs Enforcement ("ICE") with updated address and telephone contact information, and shall provide further updates to the extent his address and contact information changes during the period of release.

5. As soon as practicable following his release, Petitioner shall submit an application to ICE to obtain authorization to seek employment while on release.

6. Upon obtaining authorization to seek employment, Petitioner shall undertake reasonable effort to identify and secure gainful employment.

7. Petitioner shall report weekly to an official to be designated by ICE, in person or as otherwise directed by ICE. ICE shall be responsible for providing contact information to Petitioner to facilitate weekly reporting.

**IT IS FURTHER ORDERED THAT** Respondents' oral motion that this order be stayed is **DENIED.**

---

**20.** The Northern District of Illinois consists of the following counties: Boone; Carroll; Cook; De Kalb; Du Page; Grundy; Jo Da- viess; Kane; Kendall; La Salle; Lake; Lee; McHenry; Ogle; Stephenson; Whiteside; Will; and Winnebago.